# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

## AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION; ROSA ARELLANO; DELFINA ARIAS; SONIA MENDOZA; ROSALVA RODRIGUEZ; CANDACE MICHELLE SVENNINGSEN; MICHAEL RAY GRAVES; ALICIA RODRIGUEZ; and SERGIO B. RODRIGUEZ, <br><br>            Plaintiffs,<br>vs.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; JANET NAPOLITANO, Secretary, United States Department of Homeland Security; JOHN T. MORTON, Assistant Secretary, United States Department of Homeland Security, Immigration and Customs Enforcement; and JOHN AND JANE DOES 1-100,<br><br>            Defendants. | § § § § § § § § § § § § § § § § § | CIVIL NO.<br><br>2:07-CV-188-J |

## **MEMORANDUM OPINION**

Plaintiffs are an international food workers union and eight (8) of its members who allege that the civil rights of citizen and alien workers were violated in simultaneous plant-wide law enforcement actions by ICE at six (6) Swift & Co. meat packing plants. Plaintiffs contend *inter alia* that the workers at the plants were unlawfully detained and denied access to counsel and that the detentions violated due process because they were done without regard to the children of union members who required the care and custody of a responsible adult. The Union and individual Plaintiffs seek injunctive relief and the individual Plaintiffs seek damages. The Defendants respond that Plaintiffs do not have standing to recover the relief sought. Defendants contend that the individual Plaintiffs are not entitled to damages because their civil rights were not violated.

### *Background*

On December 12, 2006, Defendant ICE conducted six plant-wide law enforcement actions at Swift & Co.'s facilities in the United States. The eight named Plaintiffs are citizens or legal resident

1

aliens who are union members at the Swift facilities in Cactus, Texas, (five plaintiffs), Marshalltown, Iowa (two plaintiffs), and Greeley, Colorado (one plaintiff). The other three Swift facilities are located in Nebraska, Utah and Minnesota./[1] The international union has locals representing workers at all Swift facilities at issue except the meat packing plant located in Utah.

All six enforcement actions were conducted pursuant to civil warrants, issued by federal judges, which authorized Defendants to search an entire plant to locate persons who are in the United States illegally and, if they found such persons, to exercise their statutory authority as set forth in the Immigration and Nationality Act (Act), 8 U.S.C. § 1357. That statute authorizes any ICE officer or employee, without a warrant, to:

(1) interrogate any person believed to be an alien as to his right to be or to remain in the United States;

(2) arrest any alien in the United States if he or she has reason to believe that the alien is in the United States illegally,

(3) make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating aliens if he or she has reason to believe that the person so arrested is guilty of a felony, and

(4) arrest anyone for any offense against the laws of the United States if the offense is committed in the officer's or employee's presence, or arrest for any felony cognizable under the laws of the United States if the officer or employee has reasonable grounds to believe that the person arrested has committed or is committing a felony, such as identity theft or social security fraud. *Id.* at

---

[1] The Minnesota enforcement action resulted in a similar lawsuit filed in federal court in Minnesota. That case was dismissed for lack of standing and other legal deficiencies. *See Barrera v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec.*, Civ. No. 07-3879, 2009 WL 825787 (D. Minn. March 27, 2009)(concluding the union and the individual plaintiffs lacked standing to seek an injunction where their constitutional rights were allegedly violated as a result of an ongoing national initiative by ICE directed at the Swift plant in Minnesota). That dismissal was not appealed.

(a)(1)-(5). ICE officers or employees are authorized to carry a firearm and execute and serve any warrant or other process issued under the authority of the United States, such as the warrants at issue in this case. *Id.*

Plaintiffs allege that Defendants apprehended approximately 1,139 (Defendants say it was 1,297) aliens who were union members illegally working at Swift & Co. under false identities and in violation of the immigration, social security, identity theft and other criminal laws of the United States. All six enforcement actions were simultaneously conducted during the morning shift. Plaintiffs do not allege that Defendants conducted any secondary enforcement actions during evening or night shifts.

Approximately 297 persons were arrested in Texas,/[2] 252 in Colorado, 252 in Nebraska, 239 in Minnesota, and 99 in Iowa./[3] Some but not all of those aliens illegally in the country were charged with various felony crimes, including but not limited to identity theft and social security fraud. Those detainees not indicted for one or more felonies were removed from the United States by immigration authorities pursuant to the Act and returned to the countries they admitted and/or claimed as their home countries.

ICE agents in cooperation with Swift management caused all workers to be removed from their working locations and brought to a central area for separation by ICE agents into two groups – citizens and non-citizens. Plaintiffs allege that ICE agents searched the person of some of the Swift workers, and searched the personal effects of some. Plaintiffs do not dispute that pat-downs searches of Swift workers uncovered numerous knifes and pocket knives. The 100+ affidavits submitted by Plaintiffs state that the personal and locker searches were conducted for the safety of the government agents.

---

[2] The Court takes judicial notice of the fact that all of the aliens arrested at Swift & Co. in Texas who were prosecuted criminally were prosecuted in the Amarillo Division of the Northern District of Texas, before the undersigned judge.

[3] Plaintiffs do not allege how many illegal aliens were arrested or prosecuted at the Utah facility at which the union does not have a CBA in force.

The six raids followed a similar pattern. In cooperation with Swift management, teams composed of Swift supervisors and ICE agents stopped work in one area and either instructed Swift employees, or permitted ICE agents to instruct all employees, to leave their work station in a sequential manner and report to various central locations (usually the plant's cafeteria) where they could be sorted through individual interviews by ICE agents, who would then make an initial determination as to their legal status. After workers left an area, team members would sweep through the area looking for employees who were hiding from ICE. Those employees were arrested and removed to ICE detention facilities, or were escorted or sent on to the interview areas. After interviews were completed and work areas swept, employees were released to return to work, and workers in another work area were gathered for interviews./[4]

Plaintiffs do not contend that any union member was not paid during this waiting, sorting and interview process. They do not contend that Defendants' actions extended beyond the normal end of an employees' shift./[5] They do not contend that any employee lost any pay or employment benefits as a result of the raid, except presumably for the 1,139 illegal aliens arrested, deported or otherwise

---

[4] For example, at the Cactus, Texas, Swift plant management and ICE teams interviewed the 1,400 employees there in groups of 200 to 300 hundred at a time. Workers who had stayed over from the previous night shift (2 or 3 workers) were interviewed first, so they could go home. Employees who self-identified as citizens were briefly interviewed next, then released to Swift management. After their work areas had been swept of people management directed those workers to go back to work. Employees who self-identified as legal aliens were interviewed next. If they had their immigration documents, passports, or other legal identification papers with them, they were released to management and went back to work. Employees who had self-identified as illegal aliens were interviewed and removed to waiting buses for transport to the Amarillo, Texas, INS processing center. When ICE had a bus full of illegal aliens, that bus departed Cactus and those arrested were placed into the next bus waiting in line. All 1,400 interviews were completed in four hours, before the end of that day's work shift.

[5] Although Plaintiffs have not alleged a claim or cause of action for lost wages, there may be one named Plaintiff, Sergio Rodriguez in Colorado, whose detention (according to the complaint) lasted 12 hours. He was arrested because he did not have his immigration papers with him and was admittedly in violation of the law.

4

returned to their home country, or prosecuted and incarcerated for felony violations of federal laws, including but not limited to identity theft and social security fraud./[6]

At the conclusion of the interview process 1,297 workers believed to be illegally in the country were removed from the plant and transported to DHS facilities for further processing and, in at least one case, for release. Those not removed by ICE were all released to Swift's supervisors to return to work.

The complaint states that ICE agents detained union members without regard to their immediate need to provide care and custody for their minor children. However, none of the named Plaintiffs allege that they had a need to provide care and custody for their own children or had responsibility for the care or custody of any other person's minor children.

The complaint states that ICE agents coerced union members into executing waivers of their due process rights to removal hearings because there were too many detainees to process in a constitutional manner. No named Plaintiff executed such a waiver.

The eight named Plaintiffs allege that during the search and the subsequent sorting process, they were detained between three to four and a half hours at the Texas facility, for up to six to eight hours at the Iowa facility, and one worker for twelve hours in the Colorado enforcement action. Only

---

[6] This case does not arise in a vacuum. Plaintiffs' counsel Philip Russ has tried in this Court many cases arising out of meat packing plants, including Swift & Co., and was counsel of record for Plaintiffs in an earlier lawsuit, 2:07-CV-350-J, wherein the local union sued these government defendants alleging claims similar to those the international union asserts in this case. Defendants' counsel Victor Lawrence was counsel in earlier lawsuits related to these ICE raids at Swift & Co. This Court presided over the pre-raid lawsuit brought by Swift against ICE, DHS, then Secretary Chertoff and ICE Asst. Director Myers, and others to prevent the raids at issue from taking place. At the evidentiary hearing in the *Swift vs ICE* proceeding, civil action 2:06-CV-314-J, the government contended that its investigation revealed that up to 30% of Swift's 15,000 workforce were workers not legally eligible to work in the United States who were working under assumed or false identities. The government continues to make the same assertion in this case.

Review of published cases shows that a moment's inattention by a line worker in a meat packing plant can (and has) resulted in hands and fingers being severed by the power cutters and extremely sharp knives and powered saws regularly being used by line workers at such plants. The safety of workers and agents was a genuine concern in that environment.

the Colorado worker, Rodriguez, a resident legal alien who did not have his immigration papers with him at work, was allegedly removed from the workplace before being released from ICE detention several hours later. Plaintiffs, however, do not allege that any employee asked to leave, or tried to leave, or was denied the right to leave. Affidavits tendered in response to Defendants' summary judgment motion state that the workers did not believe that they were free to leave during the course of the enforcement action.

Plaintiffs complain that some were searched without a search or arrest warrant or lawful justification, that some were physically restrained, and that while detained and/or restrained they were not advised of their right to remain silent, a right to counsel, or permitted access to counsel. Plaintiffs do not allege that any Swift employee asked for legal counsel or was refused counsel upon making such a request.[7]

Class certification has been denied.

### Summary Judgment Standards

Defendants seek summary judgment. Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita*

---

[7] Plaintiff Alicia Rodriguez, a citizen and national of Mexico who is alleged to be a lawful permanent resident of the United States, further alleges in the complaint that she was hit on the shoulder by an ICE agent during the Iowa raid. However, there is no assault and/or battery or excessive force cause of action brought by Rodriguez herself, nor was there a similar claim or cause of action asserted on behalf of any Plaintiff.

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## Discussion and Analysis

### *The International Union's Standing*

Federal courts are courts of limited jurisdiction, deriving their authority from both constitutional and legislative sources. *See* U.S. Const. art. III, § II; 28 U.S.C. § 1331; *Keene Corp. v. United States,* 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). The federal judiciary's power to hear cases is constitutionally confined to "cases" and "controversies," U.S. Const. art. III, § 2, which impose certain limits on the federal courts. "One of the most important of these constitutionally-based limits is the requirement that a litigant have 'standing' to invoke the power of a federal court." *Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1346 (11th Cir. 1999). A plaintiff asserts Article III standing to sue in federal court by alleging an "irreducible constitutional minimum" of three elements: (1) an injury in fact – in other words, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between plaintiff's alleged injury and defendant's alleged behavior; and (3) a likelihood that the alleged injury will be redressed by a decision in plaintiff's favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990))(citations omitted).

For a union to have associational standing it must be an organization that meets the same standing test that applies to individuals. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). It must show a concrete and demonstrable injury to the organization's

activities – with the consequent drain on the organization's resources – constituting far more than simply a setback to the organization's abstract social interests.

There is no evidence that the International Union had objectives related to immigration enforcement actions in December 2006, or that it had longstanding commitments to challenge federal immigration enforcement actions before the actions at issue in this suit. *See Hunt v. Washington Appel Advertising Comm.*, 432 U.S. 333, 343 (1977) (for associational standing the union must meet all three test prongs, demonstrating that at the time of the Swift enforcement actions the union had as a goal the protection of member workers' rights against illegal immigration enforcement actions); *International Union, UAW v. Brock*, 477 U.S. 274, 286, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). Any future workplace enforcement actions such as that at Swift in December 2006 are not actual or imminent, they are merely conjectural or hypothetical.

There has been no workplace action involving the individual Plaintiffs or any Swift plant in three years – since this case was filed in September of 2007 – and such actions are unlikely in the near future because of the new administration's 2009 change in enforcement policy from industry-wide enforcement actions to individual criminal prosecutions.[8] The two workplace enforcement actions

---

[8]   Homeland Security Release April 30, 2009 states is part:

\*   This week, updated worksite enforcement guidance was distributed to Immigration and Customs Enforcement (ICE), which reflects a renewed Department-wide focus targeting criminal aliens and employers who cultivate illegal workplaces by breaking the country's laws and knowingly hiring illegal workers.

\*   Effective immediately, ICE will focus its resources in the worksite enforcement program on the criminal prosecution of employers who knowingly hire illegal workers in order to target the root cause of illegal immigration.

which occurred after the Swift raid and before the change of administration, the last one being in October of 2008 at a non-UFCWIU facility, appear on this record to be the end of the DHS plant-wide workplace enforcement actions. Plaintiffs' fears are purely speculative concerning whether DHS and ICE's future conduct might impede the union's lawful workplace activities. For the same reasons, the Union does not have individual standing.

Also, although there is evidence that the Union locals expended resources as a result of the Swift workplace actions, there is no explanation of any expenditure that would give the International Union standing to sue individually. An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries, i.e., those that are not "fairly traceable to the actions of the defendant." *Bennett*, 520 U.S. at 162, 117 S.Ct. 1154 (internal quotation marks omitted). Thus, allegations of injury due to resources expended bringing this or other enforcement litigation fail to demonstrate standing. *See Fair Housing Council*, 141 F.3d at 80 ("We hold, therefore, that the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III."); *Association for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994)("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

---

\* \* \* \* \* \* \* \* \* \*

\*   ICE offices will obtain indictments, criminal arrest or search warrants, or a commitment from a U.S. Attorney's Office (USAO) to prosecute the targeted employer before arresting employees for civil immigration violations at a worksite.

### The Individual Plaintiffs' Standing

Defendants assert that the individual Plaintiffs lack standing to seek injunctive relief because they will not likely suffer an invasion of a legally protected interest which is concrete, particularized, actual or imminent. Defendants correctly argue that any such future invasion or injury is merely conjectural or hypothetical.

While two Swift-type ICE workplace raids may have been conducted after December of 2006, Plaintiffs point to no subsequent workplace enforcement actions at any Swift plant or any other worksite where they were or are employed. Plaintiffs point to no actions being done in a manner similar to the Swift raids or any done at a unionized Swift plant, or at a union plant whose local is a member of Plaintiff International Union.

Also, as explained further in this opinion, Defendants are entitled to summary judgment on allegations of unlawful detention, denial of access to counsel, and that due process was denied because detentions were made without adequate care for the children of union members. Plaintiffs have not shown an injury in fact. The individual Plaintiffs do not have standing to seek injunctive relief.

### Unlawful Detention

In addition to all Plaintiffs' claims for injunctive and declaratory relief, the individual Plaintiffs seek damages against John and Jane Does 1-100 for unlawful detention based on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The complaint that workers were detained without individual probable cause is foreclosed by *NS v. Delgado*, 460 U.S. 210 (1984) and the specific work environment at issue in this case. In *Delgado*, the Supreme Court held that questioning employees in a plant-wide action with armed

officers stationed at the exits was constitutional, reasoning that there were no constitutional violations although INS had no individualized probable cause to believe that any particular individual had done anything wrong.

Plaintiffs argue that ICE should be required to go through the plant worker by worker to question workers at their workstations as the agents did in the garment factory in *Delgado*. That argument ignores the reality of the workplace environment in a meat packing plant where handguns loaded with hollow point bullets, lethal stun guns, circular saws, lethal bolt pistols, meat hooks, and extremely sharp – razor sharp – knives are ubiquitous at many workstations. Further, Swift and the FDA had legitimate concerns about contamination of the meat during the execution of the search warrants.

In determining whether workers were unlawfully detained, the Court must first determine whether there was a detention of the workers.

"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1844, 155 L.Ed.2d 814 (2003) (internal quotations omitted). Thus, an encounter between an officer or other government official and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

A seizure of the person includes not only a full-fledged arrest, but also "investigatory detentions," *see Davis v. Mississippi*, 394 U.S. 721, 726, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), and any other "detention of [a person] against his will," *see Cupp v. Murphy*, 412 U.S. 291, 294, 93

S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973). Though an individual need not be arrested in order for a seizure of the person to have occurred, the restraint on liberty typically must be effected by physical force or a show of lawful authority. *See California v. Hodari D.*, 499 U.S. 621, 626-27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred"). Such a show of force and lawful authority occurred in this case.

An individual's voluntary choices may give rise to a limitation on freedom that does not equate to a seizure by law enforcement. *Bostick*, 501 U.S. at 436, 111 S.Ct. 2382. The same is true of the work environment. "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *INS v. Delgado*, 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). However, "an initially consensual encounter ... can be transformed into a seizure or detention within the meaning of the Fourth Amendment." *Delgado*, 466 U.S. at 215, 104 S.Ct. 1758.

Resolving all inferences in favor of Plaintiffs, as the Court must do at this point, the Court concludes that the information available and circumstances apparent to Plaintiffs would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

Having found that a seizure did take place, the Court must next determine whether that seizure was unreasonable under the specific facts of this case. *See Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("[The Fourth Amendment's] central requirement is one of

reasonableness."). The reasonableness of the seizure is determined by balancing factors under the totality of the circumstances. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). Using a standard of "reasonableness," the Court must determine, in light of the competing interests involved, whether the length and conditions of the seizure were unreasonable and, therefore, constitute a violation of Plaintiffs' Fourth Amendment rights. In making this determination, the Court asks whether the seizure was 1) justified at its inception, and 2) reasonably related in scope to the circumstances that justified it. *O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492 (To conform to the Constitution, the seizure "as actually conducted [must be] reasonably related in scope to the circumstances which justified the interference in the first place.")(quotations omitted); *Florida v. Royer*, 460 U.S. 491, 504, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983)(stating that "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.").

Plaintiffs here were detained and were not free to leave until they had been interrogated. Considering the facts set forth in Plaintiffs' affidavits, each individual's interrogation was brief and was directly related to their legal status, or lack thereof. All the enforcement actions collectively lasted four to eight hours because there were four thousand employees to interrogated by agents, but no one interview was very long.

In the case of *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003), a seizure arose in a criminal context where it was clear that the officers performing the seizure were doing so in their capacities as law enforcement officials, and Plaintiffs were detained incommunicado without probable cause in order to have them submit to an interrogation. While the facts in *Ganwich* are somewhat different, the

Ninth Circuit's ruling regarding the legality of the detention favors the government's position in this case.

In *Ganwich* the Plaintiffs, employees of a business suspected of criminal wrongdoing, were detained during a search of the business' premises by officers executing a search warrant despite the fact that none of them apparently had any knowledge of their employer's allegedly fraudulent business practices. Upon serving the search warrant at the business' offices, the officers gathered the plaintiffs in a waiting room and told the plaintiffs that they were not under arrest, but that they would be held in the waiting room until they submitted to individual interviews with police investigators in a back room. During their detention, the plaintiffs were not permitted to leave the waiting room, go to the restroom unattended, retrieve personal possessions, make telephone calls, or answer the telephone when it rang. The plaintiffs were detained in this manner for up to four hours and forty-five minutes, gaining release only after submitting to tape-recorded interrogations.

The Ninth Circuit found that the initial seizure was not unreasonable under the Fourth Amendment. Because the seizure did not involve conduct that was *per se* unreasonable, the case fit "within the category of cases in which it is appropriate to balance governmental and individual interests." *Id.* at 1119-20. Specifically, the court "balance[d] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 1120 (quoting *McArthur*, 531 U.S. at 331, 121 S.Ct. 946). The court concluded that it was reasonable to detain the plaintiffs on their employer's premises during the search of the building. *Id.* In finding the detention to be reasonable, the court emphasized the important law enforcement interests it served. Holding the employees in the waiting room prevented the employees from fleeing, minimized the risk of harm to the officers, and ensured the employees were on the premises to provide the officers with necessary

assistance. *Id.* These interests outweighed the plaintiffs' privacy-related concerns implicated by their detention, which the court found "worked no great invasion of privacy." *Id.*[9]

The Court concludes that the relatively brief seizures here were not unreasonable. All employees save one were released before their normal work shift ended. Holding the employees in the cafeterias and hallways leading to the interview room prevented the employees from fleeing, minimized the risk of contamination of the meat, minimized the risk of harm to the agents and to the employees – a paramount concern in the work environment at issue in this case – and ensured the employees were on the premises to provide the officers with necessary assistance in retrieving requested documentation.

Defendants also argue that qualified immunity shields the John and Jane Doe Defendants from liability. Qualified immunity shields government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). More precisely, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right ... in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the Fifth Circuit has held, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable

---

[9] The Ninth Circuit held other aspects of the police's conduct violated the law, namely, the coerced taped interrogations of employees who were not suspected of wrongdoing. In this case, up to 30% of the Swift employees were reasonably believed to be illegal aliens, for whom warrants were issued, a significant difference from the facts before the Ninth Circuit.

government agent that what defendant is doing violates federal law in the circumstances." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997)(internal quotation and citation omitted).

Until recently, courts resolved government officials' qualified immunity claims under the strict two-part test mandated by the Supreme Court in *Saucier v. Katz*, deciding: (1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *See Saucier*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir.1998). However, the Supreme Court has revisited this rule and determined that the rigid two-step structure is no longer mandatory. *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009)(citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)). Accordingly, as the Supreme Court did in *Pearson*, this Court has considered whether the officer's conduct violated clearly established law. *Id.* at 822. The answer being no, qualified immunity will shield the *Doe* defendants from suit.

Also, it is clear that an individual's voluntary choices may give rise to a limitation on freedom that does not equate to a seizure by law enforcement. Accordingly, in turn, it is clearly established that when a person reasonably feels he is not free to terminate an encounter with an officer or other government official because he believes that doing so would lead to adverse employment action (as opposed to being physically prevented from leaving), that person is not seized under the Fourth Amendment. *See e.g., Delgado*, 466 U.S. at 218, 104 S.Ct. 1758. Here, Swift supervisors stopped the work line and instructed all employees to report to the designated interview areas. Therefore, if a reasonable officer could have reasonably believed that Plaintiffs were remaining at work and reporting to designated areas as instructed to avoid adverse employment action, then that same reasonable officer

would have no reason to believe that a seizure protected by the Fourth Amendment had taken place, nor that he was violating a clearly established constitutional right. Under these circumstances, he could also reasonably believe that if a seizure occurred, such seizure was reasonable under the specific facts of this case.

### Claim of Immediate Right to Counsel

Plaintiffs claim that union members had the right to contact their union steward, family members, co-workers scheduled to come in on later shifts, co-workers who might be coming in late, or anyone else they chose to call at the initiation of the enforcement action, during the course of the action and, by implication, a right of putative class members to make such calls immediately following the 1,139 arrests and subsequent detentions. This claim "is incorrect." *Aguilar*, 510 F.3d at 23. "Even one accused of committing a crime does not have an absolute right to place a telephone call immediately upon his apprehension." *Id.* (citing *Harrill v. Blount County*, 55 F.3d 1123, 1125 (6th Cir. 1995)).

Plaintiffs claim that Defendants violated the constitution by denying Plaintiffs access to counsel during the search of the plants. The right to counsel does not attach until criminal prosecution is commenced. *Rothgery v. Gillespie County*, 128 S.Ct. 2578, 2592 (2008) ("[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the ... right to counsel."). Because the record establishes that Plaintiffs' right to counsel had not attached at the time that rights were allegedly violated, that is, when the workers were questioned and detained at the Swift plants, Plaintiffs' claims for violation of those rights are without merit.

Further, in *Aguilar,* undocumented aliens brought a class action against ICE alleging that ICE violated various constitutional and statutory rights in connection with detaining and transferring them following a workplace raid. The district court dismissed the action for lack of subject matter jurisdiction. The aliens appealed. The circuit court affirmed, holding that their right-to-counsel claims must be administratively exhausted, *id.* at 13-14, that requiring exhaustion of their right-to-counsel claims will not give rise to a substantive constitutional question, *id.* at 14-15, that 8 U.S.C. § 1252(b)(9)(baring jurisdiction in federal district courts) is expansive enough to cover right-to-counsel claims brought by aliens in connection with removal proceedings, *id.* at 15, and that reviewing tribunals, whether administrative or later judicial, can fairly hear and determine, on the basis of the record compiled before the immigration judge, charges that ICE's actions during and after such factory raids transgressed a particular petitioner's right to counsel. *Id.* at 16. This is because such right-to-counsel claims and denial of procedural due process rights "arise from" removal proceedings. *Id.* at 14-18.

Plaintiffs claim that Defendants violated their First and Fifth Amendment rights because Defendants failed to inform them of their rights before subjecting them to interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966). A civil action for alleged violations of *Miranda* rights, however, cannot be maintained. *See Hannon v. Sanner*, 441 F.3d 635, 636 (8th Cir. 2006); *Brock v. Logan County Sheriff's Dep't*, 3 F.3d 1215, 1217 (8th Cir. 1993)(*per curiam*); *Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989)(*en banc*).

## Childcare Claim

Plaintiffs have not offered evidence that the childcare needs of any worker legally working were disrupted by the alleged detentions during the work periods. The International Union claims as members alien workers who are not legally in the United States. These claims concerning childcare are brought on behalf of the aliens who were removed from the country because they were illegally present and working under false identities at the Swift & Co. plants. These claims – that ICE violated various constitutional and statutory rights in connection with detaining and transferring them following workplace raids, ICE procedures making it difficult to secure counsel of their choosing, and the due process claim that the government violated those aliens' right to make decisions as to care, custody, and control of their children– are foreclosed for the reasons set forth in *Aguilar v. U.S. Immigration and Customs Enforcement Div. of Dept. of Homeland,* 510 F.3d 1 (1st Cir. 2007).

Regarding the claim that the government violated those aliens' right to make decisions as to care, custody, and control of their children, *Aguilar* stated that this claim in essence is that their immediate detention and swift transfer to distant places wreaked havoc with their right to make decisions about the care, custody, and control of their minor children. *Id.* at 22. *Aguilar* then went on to hold that the Plaintiffs' complaint – which alleged facts arguably more egregious than here – did not offer any reason to believe that ICE's actions were so "extreme, egregious, or outrageously offensive" as to cross the "shock the conscience" line as required by *County of Sacramento v. Lewis,* 523 U.S. 833, 846-47,118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998). As in *Aguilar,* the amount of time during which any worker was denied the ability to make arrangements for their children was not disproportionate to what was reasonably necessary to process the large number of aliens detained during the six plant raid.

## CONCLUSION

Defendants are entitled to summary judgment on the claims brought by all Plaintiffs.

Signed this 11th day of March, 2011.

*[signature]*
MARY LOU ROBINSON
United States District Judge